IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TAMMY SLATTEN | ) | |
| | ) | |
| v. | ) | No. 2:10-0077 |
| | ) | Judge Wiseman/Bryant |
| SOCIAL SECURITY ADMINISTRATION | ) | |

To:     The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial
review of the final decision of the Social Security Administration ("SSA" or "the
Administration"), through its Commissioner, denying plaintiff's application for disability
insurance benefits ("DIB"), as provided under the Social Security Act.  The case is currently
pending on plaintiff's motion for judgment on the administrative record (Docket Entry No.
25), to which defendant has responded (Docket Entry No. 31).  Upon consideration of these
papers and the transcript of the administrative record (Docket Entry No. 14),[1] and for the
reasons given below, the undersigned recommends that plaintiff's motion for judgment be
DENIED, and that the decision of the SSA be AFFIRMED.

## I.  Procedural History

Plaintiff filed her DIB application on April 19, 2006 (Tr. 103-08), with a
protective filing date of April 10, 2006 (Tr. 112), alleging disability due to degenerative disc

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

disease and resulting back, neck, and shoulder pain, as well as depression and fatigue (Tr. 117). Plaintiff initially alleged that her disability began on November 4, 2000, but subsequently amended this alleged onset date to reflect disability beginning January 11, 2006. (Tr. 112, 194). Plaintiff also supplemented her list of alleged disabling conditions, to include severe abdominal pain, post-traumatic stress disorder, and general anxiety (Tr. 194-95).

Plaintiff's claim was denied at both the initial and reconsideration stages of agency review (Tr. 68-70, 75-76), prompting her request for a de novo hearing by an Administrative Law Judge ("ALJ"). On October 21, 2008, plaintiff appeared with counsel before the ALJ, who heard plaintiff's testimony (Tr. 27-46). At the conclusion of the hearing, the ALJ took the matter under advisement until February 17, 2009, when he issued a written decision (Tr. 17-26) finding that plaintiff was not disabled by her combination of impairments and their symptoms. That decision contains the following enumerated findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since January 11, 2006, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following combined impairments: cervicalgia with neck and back pain, anxiety and major depressive disorder, not otherwise specified, and borderline intellectual functioning (20 CFR 404.1521 *et seq.*).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). She has a limited, but

2

adequate ability to maintain concentration, persistence, and pace and can perform lower level detailed work and adapt to infrequent changes in a work routine.

6.  The claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from January 11, 2006, the amended alleged onset date, through the expiration of her insured status on December 31, 2006 (20 CFR 404.1520(f)).

(Tr. 19, 21, 23, 25)

On June 1, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following, thorough record review is taken in its entirety from the brief of defendant, Docket Entry No. 31 at 2-11:

Ms. Slatten was 30 years old at the time of her alleged onset of disability. She graduated from high school in 1996 after receiving special education classes for math, reading, and spelling (Tr. 601, 716).

On November 4, 2000, Ms. Slatten was involved in a three-car accident (Tr. 596-599). According to medical records, she was sitting in a small sports car that was hit from behind, causing her car to collide with the car in front (Tr. 214, 454). Ms. Slatten

3

alleged that she experienced immediate back pain when her seat disengaged and fell backwards (Tr. 214). Six months after the accident, Ms. Slatten reported continued upper thoracic pain, as well as intermittent pain in her right leg, which was aggravated by repeated lifting at work (Tr. 214, 211). At that time, Ms. Slatten was also diagnosed with degenerative disc disease on her left side with some mild cord deflection (Tr. 209, 218). Ms. Slatten testified that in May 2001 she was terminated from her job at a nursing home for excessive absences as well as her inability to lift greater than 20 pounds (Tr. 34). Prior that position, Ms. Slatten was employed as a cashier at the Kroger Grocery Store (Tr. 37, 118).

On July 17, 2001, Ms. Slatten filed her first application for disability insurance benefits (Tr. 53). In a hearing decision, dated December 15, 2004, ALJ Robert C. Haynes found Ms. Slatten's degenerative disc disease and depression not disabling under the Act. (Tr. 53-57).

In early 2002, Ms. Slatten complained of pelvic pain, and was treated for polycystic ovarian syndrome and endometriosis (Tr. 264, 269). In 2004, the Ms. Slatten reported continued back pain, as well as neck pain, and upper and lower extremity numbness (Tr. 483).

In early 2006, Ms. Slatten reported that her chronic pain was constant, and was diagnosed with cervicalgia (neck pain not attributable to a more serious and definite cause)[2] and thoracic spine pain (Tr. 454, 456). She has received several courses in physical therapy, as well as pain medications, epidural steroid injections, and cervical traction (Tr. 454, 623). Ms. Slatten has not been found to be a candidate for surgery (Tr. 318, 880, 882).

---

[2]For a detailed description of cervicalgia, see http://www.mdguidelines.com/neck-pain.

4

Ms. Slatten also alleged that she was sexually abused as a child (Tr. 900). During the period of alleged disability, Ms. Slatten received treatment for major depressive disorder, posttraumatic stress disorder, and anxiety disorder (Tr. 901). On July 25, 2006, Ms. Slatten told her mental health professional that she had been trying to get a job until she was "told she couldn't if she wanted SS" (Tr. 712).[3]

## A. Hearing Testimony

At the administrative hearing, Ms. Slatten testified that her "main" medical problems were the pain in her leg and between her shoulder blades, "female problems," and depression (Tr. 37). Ms. Slatten also testified that her pain was "constant" and activity "makes it worse" (Tr. 38). Ms. Slatten reported that she is able to drive, shop, and attend church twice a week (Tr. 32, 33, see also Tr. 131, 476). Ms. Slatten testified that going to church or engaging in other activities causes her to be in bed the next day (Tr. 38). She stated that she cares for her young child with assistance (Tr. 36). Ms. Slatten testified that in February 2006, she babysat for her two-month old and nine-month old nephews during the day while caring for her daughter, but had to stop babysitting after a month (Tr. 34). Ms. Slatten also reported that she attempted to go to yoga once a week for a couple of months during the same period, but could not perform the poses (Tr. 35). She testified that she has carpal tunnel syndrome, which she stated causes cramping, numbness, and pain in her hands (Tr. 42-43). Ms. Slatten testified that her depression and anxiety cause her to avoid social interactions (Tr. 45).

---

[3] Presumably, "SS" stands for "Social Security."

B. <u>Medical Evidence of Record</u>

In April 2005, Ms. Slatten's cervical MRI showed a small right paramedian disc protrusion at the C3-4 level without cord compression (Tr. 318, 333). No abnormalities of the cervical spinal cord were observed (Tr. 318, 333). There was also no evidence of central or foraminal stenosis (Tr. 333).[4] Dr. Thuy T. Ngo at Cookeville Neurology could not find "a clear physiologic explanation for her chronic pain disorder" (Tr. 318). He recommended Ms. Slatten be followed by a local pain center and continued her prescription for Neurontin 300 mg three times a day until she could see a pain specialist (Tr. 318).[5]

In January 2006, Ms. Slatten underwent additional MRIs of the cervical and thoracic spine (Tr. 329, 330, 358. 359). The cervical spine MRI showed a herniated disc at the C3-4 level paracentrally on the right abutting the cervical spinal cord, with no other evidence of disc bulging or herniation (Tr. 329, 358). No areas of stenosis were evident (Tr. 329, 358). The radiologist reported that "[t]he cervical spinal cord appears normal" (Tr. 329, 358). The thoracic spine MRI revealed small osteophytes at the T12-L1, T7-T8, and T6-T7 levels, which did not appear to be causing significant canal compromise (Tr. 330, 359). No frank disc herniations were observed (Tr. 330, 359). The radiologist noted that the scans were otherwise unremarkable, and the thoracic spinal cord appeared normal (Tr. 330, 359).

---

[4]Spinal stenosis "is a narrowing of any part of the lumbar spine, including the spinal canal, nerve root canal, and intervertebral foramina, that that may occur at single or multiple spinal levels." <u>See</u> <u>Emergency Medicine: A Comprehensive Study Guide</u>, Section 24- Nontraumatic Muscoskeletal Disorders (6th ed. 2004).

[5]Gabapentin (Neurontin) is used to treat certain types of nerve pain. <u>See</u> http://www.drugs.com/neurontin.html.

6

On January 31, 2006, Ms. Slatten began a new course of physical therapy at the Curran Rehabilitation Clinic (Ex. 9F, Tr. 454-480). At the initial evaluation, Ms. Slatten reported that she could lift her two year-old daughter, who weighed approximately 20 pounds, as well as her nine month-old nephew (Tr. 456, 474). She additionally stated that she could do heavy housework with some pain (Tr. 456). During the course of her therapy, it was noted that Ms. Slatten had no problems babysitting or participating in her yoga class (Tr. 469). Ms. Slatten's physical therapist consistently rated her progress as "good" or "excellent" (Tr. 460, 461, 463, 464, 466, 467, 468, 469, 470). On March 22, 2006, Ms. Slatten was discharged from physical therapy; her Instrumental Activities of Daily Living and work performance had improved and her "pain goals" had been met (Tr. 472).

However, less than two weeks later, Ms. Slatten returned to the Cumberland Back Pain Clinic complaining of neck and shoulder pain (Tr. 676). At that time, her pain medications included Kadian 20mg twice a day (treats chronic moderate to severe pain), Orphenadrine 100mg twice a day (muscle relaxant), and Sulindac 200mg twice a day (nonsteroidal antiinflammatory drug) (Tr. 623, 641).[6] While Ms. Slatten complained of worsening pain, it was noted that she was able to ambulate independently, and her gait was steady (Tr. 676, 677).

Ms. Slatten was referred to William Schooley, M.D., a neurosurgeon with Neurosurgical Associates in Nashville (Tr. 677). Dr. Schooley diagnosed her with cervical

---

[6]Drug descriptions are available at http://www.drugs.com/.

7

spondylosis and ordered an eight-pound cervical traction (Tr. 623).[7] On May 23, 2006, a

lumbar MRI showed a shallow right central disc protrusion at the L1-2 level that mildly

narrowed the right lateral recess (Tr. 491). The vertebral height, alignment, and marrow

signal were normal (Tr. 491). Dr. Schooley fitted Ms. Slatten with a back brace and ordered

epidural steroid injections (Tr. 625, 626).

      In January and February 2007, Ms. Slatten received epidural steroid injections

at the Center for Spine, Joint and Neuromuscular Rehabilitation (Tr. 892-898). At her first

physical examination, Dr. Victor Isaac observed that Ms. Slatten appeared in "no acute

distress," could "concentrate well," and had a normal gait (Tr. 897). Manual muscle testing

revealed 5/5 strength in both of her upper and lower extremities (Tr. 897). In addition, Dr.

Isaac reported:

> Gentle P-A digital palpation of the cervical segments on the spinous processes in the
> supine position is painless. Digital palpation of the facet line is painless
> bilaterally. Segmental exam of the cervical spine reveals no evidence of laxity,
> subluxation, dislocation, asymmetry, or instability. Myofascial exam of the
> cervical spine is within normal limits. Spurling's testing is positive on the right
> side.

(Tr. 897).

      In a follow-up visit on May 14, 2007, Ms. Slatten reported that she "was doing

well until [she] fell out of the shower and hit [her] head on the commode" (Tr. 890). She also

stated that her "pain was 'a lot better' [after the epidural injections] but she still required

pain medication" (Tr. 890). She reported continued spasms in her neck and right arm with

---

[7]Cervical spondylosis is the degeneration of the disks and vertebrae in the neck, compressing
the spinal cord in the neck. For a detailed description of cervical spondylosis, see
http://www.merckmanuals.com/home/sec06/ch093/ch093d.html.

8

her arm going numb at night (Tr. 890). Upon physical examination, she exhibited normal range of motion of the cervical spine in all planes with mild to moderate end ranges of motion (Tr. 890). While she had "marked palpable tenderness" in the neck and shoulders; the shoulder joints, muscle stretch reflexes, manual muscle testing, and sensation to pinprick for the bilateral upper extremities were within normal limits (Tr. 890).

On June 6, 2007, another cervical spine MRI showed broad-based central disc protrusion at the C3-4 level with mild central canal stenosis, but no significant foraminal narrowing (Tr. 885). Ms. Slatten rated her pain at five out of ten (Tr. 884). Ms. Slatten also demonstrated moderate decreased range of motion of the cervical spine in all planes with moderate ranges of tenderness noted (Tr. 882, 884). Ms. Slatten was referred back to Dr. Schooley for surgical reevaluation; however, Dr. Schooley referred Ms. Slatten to physical therapy instead (Tr. 880, 882).

In September 2007, Ms. Slatten reported her "pain regimen is working" (Tr. 880). In October 2007, she reported feeling better with physical therapy (Tr. 879), but also noted that physical therapy did not provide lasting relief (Tr. 878). In December 2007, Ms. Slatten reported that her pain was five out of ten but she was able to exercise at home (Tr. 877). In 2008, Ms. Slatten reported that her pain fluctuated between eight out of ten and four out of ten depending on whether she was taking medication (Tr. 871-876). While she was on medication, she did not report significant changes in her pain level, indicating she was comfortable on her medication regime (Tr. 863, 865, 867, 869, 871, 873, 875).

In addition to the medical conditions described above, Ms. Slatten has also undergone a left thyroid lobectomy (Tr. 820-855), and a laparoscopy in treating her endometriosis (Tr. 798). On January 17, 2008, Ms. Slatten was reported to have normal

9

range of motion of her extremities (Tr. 809). On June 30, 2008, Ms. Slatten reported "not having any significant pain" (Tr. 807).

C. <u>Residual Functional Capacity Assessments</u>

On June 8, 2006, Mona K. Mishu, M.D., a State agency medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment (Tr. 607-614). Upon review of the record, Dr. Mishu found that Ms. Slatten could lift and/or carry 20 pounds occasionally, 10 pounds frequently, and she could sit and stand/walk about six hours in an eight-hour day respectively (Tr. 608). Dr. Mishu noted that Ms. Slatten was babysitting at home for a two-month old and a nine-month old, while caring for her two-year old daughter (Tr. 614).

On October 7, 2008, almost a year after he had last treated Ms. Slatten, Dr. Schooley completed a Physical RFC Questionnaire, diagnosing her with "cervical and lumbar spondylosis" with a "poor" prognosis (Tr. 857). When asked to identify the clinical findings and objective signs, he noted "[patient] [complains of] pain" (Tr. 857). When asked to characterize the nature, location, frequency, precipitating factors and severity of Ms. Slatten's pain, Dr. Schooley left the answer field blank (Tr. 857). Dr. Schooley stated that Ms. Slatten could lift and/or carry up to 20 pounds frequently, 50 pounds rarely, and could sit and stand/walk about two hours total in an eight-hour day respectively, forty-five minutes continuously (Tr. 858, 859). According to Dr. Schooley, Ms. Slatten would need to take unscheduled breaks "frequently," shift positions at will from sitting, standing, or walking; and walk for five minutes every five minutes (Tr. 859). He opined that her symptoms would "frequently" interfere with the attention and concentration needed to perform even simple work tasks (Tr. 858). Dr. Schooley indicated that Ms. Slatten could rarely look down, turn

10

her head right or left, look up, hold her held in a static position, twist, stoop, crouch/squat, and climb ladders and stairs (Tr. 860). Finally, he stated that Ms. Slatten would only be able to grasp, turn, or twist objects; perform fine manipulations; or reach overhead half of each work-day (Tr. 860). In Dr. Schooley's opinion, Ms. Slatten would average about three absences a month due to her medical condition and/or treatment (Tr. 860).

On July 25, 2006, Ms. Slatten reported to her mental health professional that her pain and ruminations about her sexual abuse were causing her to feel depressed, helpless, lethargic and lonely (Tr. 712). On October 25, 2006, Linda Blazina, Ph.D, examined Ms. Slatten in connection with her application for disability benefits (Tr. 714-720). Ms. Slatten stated that she was able to complete self-care tasks independently as well as care for her daughter (Tr. 716). She reported that she was able to drive and manage money without difficulty, and that she could shop without assistance (Tr. 716). She further stated that at home, she does some housekeeping chores, such as laundry once a week, dishes twice a week, and cleans the floors once a month (Tr. 716). She reported that she cooks a meal three times a week and uses the microwave regularly (Tr. 716-717). She also stated that she attends church, goes out to eat with her husband and daughter once a week, and sees family members (Tr. 717).

On administration of the Wide Range Achievement Test 3rd Edition (WRAT-3), Ms. Slatten read and performed arithmetic computations on a fourth grade level and performed spelling on a third grade level (Tr. 718). On the Wechsler Adult Intelligence Scale-III (WAISIII) test, Ms. Slatten attained verbal, performance, and full-scale IQ scores of 78, 73, and 74 respectively (Tr. 717, 718). These test scores placed Ms. Slatten's level of intellectual functioning in the borderline range (Tr. 718). Dr. Blazina observed that Ms.

11

Slatten appeared "mildly depressed and anxious" (Tr. 718). Depressive and anxiety disorders, not otherwise specified, and a Global Assessment of Functioning Scale ("GAF") score of 70-75 were assigned (Tr. 719).[8] Dr. Blazina stated that Ms. Slatten did not appear limited in her ability to socially interact, adapt, and understand and remember short, simple instructions (Tr. 719). Her ability to sustain concentration and persistence were mildly limited due to her anxiety (Tr. 719). Dr. Blazina opined that Ms. Slatten would have mild to moderate difficulty understanding and remembering complex, detailed instructions (Tr. 719).

Victor L. O'Bryan, Ph.D., a State agency psychology consultant, reviewed Ms. Slatten's records in November 2006, and opined that she could do lower level detailed work and adapt to infrequent changes in a work routine (Tr. 737). She had a limited, but adequate ability, to maintain concentration, persistence, and pace (Tr. 737).

D. Ms. Slatten's Work History and Vocational Consultants' Comments

As described above, Ms. Slatten has a prior work history as a nursing home attendant and a grocery store cashier/checker (Tr. 34, 37, 118). Two Tennessee Department of Rehabilitation Services vocational consultants categorized her past relevant work as a cashier/checker as light exertion, low semi-skilled work. (Tr. 157, 159, 175). On July 3, 2006,

---

[8]The Global Assessment of Functioning Scale is the "clinician's judgment of the individual's overall level of functioning" on a 0-100 scale. A 70-61 rating indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupation, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." An 80-71 rating shows that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school function (e.g., temporarily falling behind in schoolwork)." Diagnostic and Statistical Manual of Mental Disorders 32 (American Psych. Assoc., eds., 4th ed., 1994).

Teresa M. Thompson opined that Ms. Slatten possessed "[l]ight RFC with no other restrictions. Can return to past light work as a [grocery] store cashier" (Tr. 159). On November 13, 2006, Brian T. Farr also opined that Ms. Slatten was capable of light/low-skilled work, noting her moderate mental limitations (Tr. 174-175). Mr. Farr did not find Ms. Slatten to have postural or manipulative limitations (Tr. 174).

### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

13

12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be disabled.

> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.

> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be

14

used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff first argues that the ALJ erred in generally finding that her musculoskeletal conditions were not of the severity required by the pertinent, listed impairments of Appendix 1, 20 C.F.R. Part 404, Subpart P, without specifically discussing the criteria of section 1.02 (describing "major dysfunction of joints (due to any cause)").  Plaintiff argues that the injury to her cervical spine, resulting in an "extruded herniated disc at C3-4 ... abutting the cervical spinal cord" (Tr. 329), and the involvement of both of her hands and wrists, amounts to an impairment which satisfies Listing 1.02(B).  The full text of Listing 1.02 is as follows:

1.02  *Major dysfunction of a joint(s) (due to any cause):*   Characterized by

gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

    A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

       or

    B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Section 1.00 B2c in turn defines "inability to perform fine and gross movements effectively" as "an extreme loss of function of both upper extremities; i.e.,

[A]n impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.  Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 1.00B2c, 1.02.

      Plaintiff's argument based on the listings must fail on its own terms.  In order to meet or medically equal a listing, <u>all</u> the criteria of the listing must be established in the medical evidence, or fairly represented by comparable, documented findings of equal

16

medical severity.  See Sullivan v. Zebley, 493 U.S. 521, 531 (1990).  While plaintiff recognizes this requirement in her brief (Docket Entry No. 26 at 7), her ensuing argument ignores the absence of listing criteria, or their medical equivalents, from the medical evidence in this case.  Plaintiff argues that the ALJ erred in failing to explicitly address Listing 1.02 . However, the ALJ did explicitly reference his consideration of musculoskeletal impairments (to which category  belong the impairments recognized in § 1.00 et seq.), and found no medical evidence of any such impairment at a listing level of severity.  (Tr. 21)  While this finding is not supported by any particular analysis, it is not legally insufficient in view of the absence of record evidence indicating that plaintiff's impairments could be viewed as meeting or equaling Listing 1.02.  See Price v. Heckler, 767 F.2d 281 (6th Cir. 1985); Bledsoe v. Barnhart, 165 Fed. Appx. 408, 411 (6th Cir. Jan. 31, 2006); Motley v. Comm'r of Soc. Sec., 2009 WL 959876, at *13 (S.D. Ohio Apr. 8, 2009) ("Where, as here, the evidence of record suggests plaintiff may meet or equal Listing 1.02A, the ALJ is required to perform a meaningful analysis to enable the Court [to] perform its reviewing function.").  Specifically, there is no evidence of any gross anatomical deformity of any joint sufficient to satisfy the listing characteristic.  Moreover, the record is replete with evidence that plaintiff is able to sustain at least such manipulative function as is necessary to carry out activities of daily living, despite any hand-wrist joint dysfunction, such that she cannot be said to experience "an extreme loss of function of both upper extremities[.]"  With all due respect, plaintiff does not come close to establishing presumptive disability under Listing 1.02.[9]  The ALJ's step

_____

[9]Plaintiff's argument also mentions, in passing, meeting the criteria of Listings 1.04 and 1.08. (Docket Entry No. 26 at 7)  However, plaintiff does not otherwise argue these points or support them with any citation to record evidence.  Accordingly, to the extent an issue can be deemed raised with respect to these listings, the court should consider it waived.  See McPherson v. Kelsey, 125 F.3d 989,

17

three finding is supported by substantial evidence.

Plaintiff next argues that the ALJ erred in rejecting the opinion of her treating neurologist, Dr. Schooley, without good reason. The medical opinion of a treating source such as Dr. Schooley is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and not substantially opposed on the record. Even where such an opinion is not entitled to controlling weight, the Sixth Circuit has stated that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference. . . ." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). Accordingly, ALJs must provide "good reasons" for discounting the weight of a treating source opinion. See 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); Rogers, 486 F.3d at 242. In this case, the ALJ offered the following rationale for rejecting the October 7, 2008, assessment of Dr. Schooley:

> The undersigned gives no weight to the functional assessment of Dr. Schooley. Said assessment, which limits the claimant to a reduced range of sedentary exertion activity, is wholly inconsistent with her benign objective tests and scans and contrasts sharply with the other evidence of record, which renders it less persuasive. ... [10] Additionally, it is inconsistent with the claimant's reported daily activities, outlined below. The only remaining physical functional assessment of the claimant in the record is that of the State Agency physician which indicated the claimant was capable of light exertion.

---

995-96 (6th Cir. 1997).

[10]Omitted from this paragraph are three sentences in which the ALJ asserts his own suppositions about the motives of treating physicians in supplying assessments which might help their patients' cases for disability. These sentences add nothing to the ALJ's analysis of Dr. Schooley's assessment, could not possibly be considered "good reasons" for rejecting any particular treating source opinion, and so are not worthy of mention here.

(Tr. 24)

Indeed, Dr. Schooley's assessment that plaintiff could lift up to twenty pounds frequently and, rarely, up to fifty pounds, but was in all other exertional and postural respects severely limited by the pain she complains of, is at odds with not only the other medical evidence, but also the record evidence of plaintiff's level of activity during 2006, which included, e.g., completing self-care tasks independently, caring for her 3 year old daughter while her husband was at work, driving, shopping without assistance, performing some housekeeping chores such as laundry once a week, dishes twice a week, and cleaning the floors once a month, cooking a meal three times a week, attending church, going out to eat with her husband and daughter once a week, and seeing family members (Tr. 716-17). While Dr. Schooley was plaintiff's treating neurosurgeon during part of the year-long period under review here, his specialization and the fact that he may be highly regarded, as asserted by plaintiff, are insufficient to salvage his assessment, which is admittedly based on plaintiff's complaints of pain. (Tr. 857) Section 404.1527(d) of the SSA's regulations prescribes that, in weighing a treating source's opinion, the ALJ is to consider (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, and (5) the specialization of the treating source. Where the treating physician's opinion is based largely on his patient's subjective pain complaints, and does not identify other medical grounds for the restrictions imposed, the opinion's weight is appropriately discounted if the ALJ finds the claimant's credibility lacking. See Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 877 (6th Cir. 2007). The reasons identified by the ALJ for

19

rejecting Dr. Schooley's assessment are good and sufficient, and his decision to adopt the nonexamining state agency physician's assessment of light work capability, as more consistent with the record as a whole, is substantially supported.

Finally, plaintiff argues that the ALJ's finding of her ability to return to her past relevant work as a cashier is erroneous because the demands of such work exceed her exertional capacity as determined by Dr. Schooley. Inasmuch as the undersigned is unpersuaded that the ALJ improperly rejected Dr. Schooley's opinion, as determined above, plaintiff's final argument is likewise without merit. Plaintiff's past relevant "light" job as a cashier appears to be work within her residual functional capacity (Tr. 157, 159, 175), and the ALJ's determination of this case at step four is thus substantially supported.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

20

**ENTERED** this 2nd day of September, 2011.


 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE